Case No. 4,228.

Ex parte DYSON.

[3 App. Com'r Pat. 375.]

Circuit Court, District of Columbia. Sept. 21, 1860.

DUNLOP, Chief Judge. This is an appeal to me by Jeptha Dyson from the decision of the commissioner of patents. of date 7th July, 1860. refusing him a reissue of his patent of the 20th February, 1849 [No. 6,135], for improvements in carding engines, with amended specifications and claims. The gist of Mr. Dyson's invention is the differential motion of the stripper, A, introduced upon the engine, to clear the main cylinder, C, of the cotton imbedded in it in the process of carding without stopping the machine by this self-acting contrivance. His original specification described only the fast motion of the stripper, A, which fast motion, was of a surface speed, exceeding the surface speed of the main cylinder. C, the effect of which was to make A a clearer of C. It did not describe the slow motion of the stripper, A, reducing its surface speed below the surface speed of the main cylinder. "C," by means of a loose pulley on the shaft of A, the effect of which slow or differential motion of A at intervals made "C" a clearer of A, and enabled A again to resume its functions of clearing the main cylinder, "C," and thus to keep the engine in constant working order. Mr. Dyson's original patent is inoperative and invalid as a self-active contrivance to clear the main cylinder by his failure to describe this differential motion of A. Without it, A cannot be itself cleared when clogged with embedded cotton in it, and so cannot perform its function as a clearer or stripper of C. Mr. Dyson has sworn that his omission to describe in his specification this differential motion was by accident, mistake, or inadvertence, and without any fraudulent or deceptive intention, and that he designed originally to patent it, in February, 1849; and he has proved by four witnesses that before the original patent was applied for they saw Mr. Dyson's engine worked with this differential motion, and that it never was worked otherwise. The office has rejected Mr. Dyson's reissue application because the original specification, model, and drawings do not, nor does either of them, show the differential motion; and they refuse to look at any evidence outside the "record," as they call it. They refuse to receive any proof other than the original record, however plenary it may be, to show this differential motion to be the same invention intended to be patented by him in 1849; although the original specification and claim, in asserting a self-acting contrivance. does point to some other mode of clearing "C" than is set forth therein.

I agree with the office, it is too obscure and vague alone and without further proof in aid of it to be the basis for inserting in the reissue the differential motion. It is at most a circumstance to uphold and fortify the aliunde proof, or the evidence of the witnesses outside the record. Can such outside proof, if plenary and credible, sustain the reissue? This depends upon the true interpretation of the 13th section of the act of 1836 [5 Stat. 122].

The question is not free from difficulty, as will be apparent when I state it has been decided differently by two able and distinguished ex-commissioners of the office. I refer to the Case of Jeremiah Cohart, decided by Judge Mason in 1856, and to the Case of Adriance, assignee of Gale, decided in 1858 by Judge Holt. I have given to the subject the most careful and anxious consideration, and will state the reasons which have controlled my judgment. They have satisfied my own mind, and if they fail to satisfy others whose right may be thereby compromised, I have the consolation to know that these reasons may be reviewed, and, if wrong. reversed, before the proper judicial tribunals. My judgment can only give to Mr. Dyson a prima facie title to his reissue, which is still open to contest in the courts by those who have a standing in them to dispute its validity. The 13th section of the act of 1836, or so much of it as relates to this case, is in these words: "That when ever any patent which has heretofore been granted, or which shall hereafter be granted, shall be inoperative or invalid, by reason of a defective or insufficient description or specification, if the error has or shall have arisen by inadvertency, accident or mistake, and without any fraudulent or deceptive intention, it shall be lawful for the commissioner upon the surrender to him of such patent and the payment of the further duty of fifteen dollars, to cause a new patent to be issued to the said inventor for the same invention, for the residue of the period then unexpired for which the original patent was granted, in accordance with the patentee's corrected description and specification," &c., &c., (providing for assignees and legal representatives), "and the patent so reissued, together with the connected description and specifications, shall have the same effect and operation in law on the trial of all actions hereafter commenced for causes subsequently accruing, as though the same had been originally filed in such connected form before the issuing of the original patent."

The first remark I make upon this section is that, as the commissioner is a public officer, and the power conferred on him in this section, concerns others (patentees), and is beneficial to them to have executed, the words in the section, "it shall be lawful for the commissioner upon the surrender to him of such patent." &c.. "to cause a new patent," &c., "to be issued," &c., are to be construed as

mandatory, and to be of the same import as if the words had been "it shall be the duty" of the commissioner; that is to say the true meaning is that the commissioner is to have no discretion in the case provided for in the section.

When the case provided for arises, he is commanded to exercise the power, whether he thinks it just and right to exercise it or not. In the case assumed in the section to exist he has no discretion. For this principle of law I refer to the case of Mason v. Fearson, 9 How. [50 U. S.] 249. In that case the supreme court say: "Whenever it is provided that a corporation or officer 'may' act in a certain way, 'or' it shall be lawful 'for them to' act in a certain way, it may be insisted on as a duty for them to act so, if the matter, as here, is devolved on a public officer, and relates to the public or third persons." The next remark I make upon this section is that by its terms, when the case of honest mistake arises, or a defective or insufficient description or specification, the only limitation on the reissue patent for his amendment or correction is that it shall be for the same invention. The closest inspection of the section will show no other limitation. By the terms of the section no mode of proof is pointed out to show the invention claimed on reissue to be the "same invention" that is left at large. There is no prohibition of any particular species, or class of evidence. In the absence of such prohibition, how can any legal evidence to establish the invention to be the same invention be excluded? By "legal evidence" I mean all such evidence only as by the rules of law, and the adjudication of the courts is receivable to establish any like fact in controversy before them.

In the case supposed of honest mistake, the section gives to the reissue applicant an absolute, vested right to his amendment, dependent solely upon the condition that his amendment shall cover the same invention originally intended to be patented. As he is not limited to the section to prove this fact by any specially presented testimony, how can it be said the legislature did not intend the whole range of legal proof should be open to him? How can the office rightfully undertake to say he shall only prove it by their record; that is, only by the specification, model, and drawings; that no evidence, however plenary and credible, by competent witnesses, will be listened to, or looked at. Cases, it seems to me, may be put in which this inexorable rule would not only work great injustice to individuals, but in fact repeal this reissue section. The patent laws provide for "inventions" which do not require models and drawings. Models and drawings, are only required by law where they illustrate, the invention claimed, and are thought necessary by the commissioner. Compositions of matter are by law patentable. In such cases there are no drawings and models. They are not needed. All that is required is

a specification. The merit and usefulness of the "invention" consist (we may say for illustration) in the admixture of certain ingredients in certain proportions, compounded in a particular manner. If an honest inventor inadvertently and by mistake errs in his original specification as to the ingredients, the proportions, or the mode of mixture, is he to be without remedy by reissue? By the office rule he would be. There is no model or drawing to amend by. They were not required nor necessary. He cannot amend by the "specification;" that is defective, and good for nothing. It is the very thing he wants to make good by amendment, and which the 13th section gives him the right to amend. The office rule excludes him from relief because he cannot prove his case by the record, and the reissue section is virtually repealed by the office.

Again, put the case of a "machine" where a model and drawing are necessary, and have been deposited in the office, according to law. Put the case of the carding machine, now in controversy. It does not properly belong to the model and drawings to show the rate of speed at which the cylinders are driven in that machine. That is the appropriate function of the "specification." The merit of the invention, in this case, consists in that rate of speed. The inventor swears that by mistake he failed accurately to describe the speed, or rather the differential speed, of one of the cylinders, which he intended to patent in 1849, and proves by four witnesses that they know the machine, before the date of the patent and before the patent was applied for by Mr. Dyson, to be worked with this differential motion of the stripper, A, and to be only so worked. Is the invention, in such a case, to be deprived of relief by reissue? The office rule excludes him, because their record does not show any thing to amend by, because it does not show the thing to be amended. It was not, in this case, the function of the model and drawings to show the error, and they are therefore, as to this point, as if they did not exist The only part of the office record by which the inventor could amend is the "specification," and that is the document, he avers, to be mistakenly wrong, and which the reissue section was intended to enable him to put right. If that document is wrong, it can not be put right by itself, and the model and drawings being out of the way, as not the appropriate means to furnish the evidence, such evidence can only be got aliunde or outside of the office record. If this is not received, there is a failure of justice.

Again, put the case in which the model and drawings are necessary, and in which their proper function is to show the whole "invention," and every part of it. If the honest inventor by mistake fails to show his entire invention, either by the specification, model, or drawing, is he to be without remedy? The office rule says he is, but even

there—which is the strongest case against an inventor—the statute does not, in terms, exclude him. I agree, in such a case, where all the three elements of proof which ought to serve him fail, it is strong, if not pregnant, evidence of a fraudulent and deceptive intention; but, after all, even in that case it is only a question of the weight of evidence. It may, I think, under the statute, be met and rebutted by plenary and credible proof outside the record. The commissioner in the Case of Adriance, assignee of Gale, seems to think that on a reissue there is a material difference between a defective and insufficient description and no description at all, and that it is the former only, that the 13th section, truly construed, allows to be corrected. If the commissioner is right in this construction, then, if there was no description in the "specification" of the real invention, although the drawings and model fully set it forth, the applicant would be without remedy; but the office does not now, and I believe never did, press their rule to that extent, and the commissioner's reason for this construction of the statute is that the introduction by reissue of features or devices not described at all or shown in the drawings and model "would destroy the identity of the invention as patented," and hence "the new patent would not, in strictness of language, be for the same invention as the old, which the law requires it shall be." Now, I cannot see that a defective and insufficient description is any better than none. Neither of them is any foundation for an operative patent. If it does not cover the invention the patentee seeks, and secure his rights, it is worthless, and no better than no description. This construction seems to rest on verbal criticism merely. Nor is the reason given, sound and tenable. The reason is that new features introduced would destroy the identity of the invention patented, and would not, in strictness of language, be for the same invention.

Now, it is very clear that the identity of the invention patented is always destroyed by a reissue. The sole object for a reissue, as intended by the applicant and provided for by law, is to give to the patentee something additional, though it be the same invention,—that is to say, something not in the old patent; and to this extent every reissue destroys the identity of the patented invention. There would be no sense or use in the reissue unless it added something to what was already patented. If it left the old patent intact or identical as to invention, the patentee would gain nothing by his application, and the reissue statute, so construed, would fail to effect any good to the patentee, and might as well be blotted from the statute book. What the legislature designed to secure to patentees by this 13th section was to enable them to cure honest mistakes, and to get, substantially, protection for the same invention they had made and intended to be patented, when the original defective patent was granted. The only limitation in the statute is that the invention should be the same. The legislature has not said by what proof the applicant shall show his invention claimed on reissue to be the same invention made and intended to be got on his original application. He is not limited by the statute to prove it by the specification, model, or drawings. Any legal proof to show it to be the same invention, whether found in the record or aliunde, ought to be received and weighed by the office. No authority by law is given to the office to limit the range of the applicant's proof if it is such as, upon the law of evidence, is held sufficient to prove facts before other legal tribunals. The commissioner of patents, by the 12th section of the act of 1839 [5 Stat. 355], has "power to make all such regulations in respect to the taking of evidence to be used in contested cases before him as may be just and reasonable." But the office has no right to make new rules of law, or to divest vested rights by its rules of practice. No such power exists in any court, not even the supreme court. The rules of practice of all courts are made in subordination to law, and no court in this country, so far as I know, can change, abrogate, or limit the known rules of evidence.

If these rules of evidence work injustice, and lead to fraud and perjury, congress must change them, and not the office. But I see no reason to think that fraud and perjury are more likely to be practiced on a reissue than on an original application. Where an invention is valuable, and large gains to be made, fraud and perjury are apt to be practiced, as they are in all other human transactions outside of the office where great profit is to be attained. Fraudulent inventors must be met, as all other fraudulent or perjured actors are, by the ordinary legal remedies. The public and the members of it injured must prove and expose the fraud and perjury, and punish the transgressors. Because this is often difficult to be done, innocent inventors ought not to suffer, who seek to correct errors, the result only of honest mistake, inadvertence, or accident; more especially when such right of correction is expressly conferred by statute. It is said the office may be deceived, and made the innocent instrument of deception by granting patents for the like invention to subsequent claimants. When this is so, the office has only to declare an interference, and then the truth can be brought out. At all events, the subsequent patentee can then bring his adversary face to face, and cross-examine his witnesses, and offer evidence on his own part, to expose any attempted fraud or perjury. The 26th rule of the office is referred to in the Case of Adriance, assignee of Gale, to justify the exclusion of any other evidence on a reissue than is furnished by the "record;" that is to say the specification, model, or drawings. That rule is in these words,

or the portion of it relied on: "A specification cannot be amended in any material part unless there is something to amend by; that is to say, it can only be amended to cause it to correspond with the drawing or model." But this rule applies only to original applications, and is classed and appears under that head. It is furtherance of justice, and to secure the revenue of the office, and not contrary to the statute. An original applicant has no right by law to amendment, unless by the 7th section of the act of 1836, after his first rejection, to conform his specification to the alterations suggested by the commissioner. It is in the discretion of the office, in all other cases, to grant the amendment or not, and, when granted, to impose such terms as are just. The legal right of the rejected original applicant is not to amend, except in the case above alluded to, but to withdraw, his application, leaving ten dollars in the treasury, to pay the office for its trouble.

If this rule did not exist, the original rejected applicant, on the old fee of thirty dollars, might by amendment, make an entirely new case as often as he saw fit, to the annoyance of the office, and in evasion of its rightful revenue. Not so in the case of a reissue. The amendment there is not of grace, but of right. It is secured by the statute. The applicant is to pay fifteen dollars towards the revenue, and is limited to "the same invention" intended to have been embraced in the original defective patent. When these conditions are complied with, his right to the amendment is perfect under the law. This 26th rule therefore does not apply to reissues. It would be void if it did, because contrary to law; and the failure of the office so to apply it contradicts, rather than sustains, the construction of the 13th section now insisted upon. The 44th rule of the office, which does relate to reissues, was not relied on by the commissioner who decided the Case of Adriance, assignee of Gale, although it is relied on by the present commissioner in his answer to the reasons of appeal. That rule is in these words: "The general rule is that whatever is really embraced in the original invention, and so described or shown that it might have been embraced in the original patent, may be the subject of a reissue." This rule is very cautious and general in its terms, and properly so. It does not profess to be without exception. It is only a general rule. It states what may be the subject of a reissue. It does not say what shall not be. It states one mode of showing the invention to be the same invention, and even this in vague and ambiguous terms; but does not prescribe that this shall be the sole and only mode. It leaves special cases; as I construe it, open to be determined by the law applied to their particular circumstances. At all events, it is not, in the bold and peremptory terms of the rule of practice, laid down by the board of appeals in their report in this case. The counsel who has argued this case for Dyson, who was himself long a commissioner, insists that the practice of the office has been the reverse of that alleged in the report of the appeal board. He refers to Couillard or Quillards Case [unreported], in 1838; Woodworths Planing Machine Case, in 1845 [Case No. 18,011]; Pond's Case, in 1847, Letter Book, 345; and in 1856 to Jeremiah Corhart's Case, decided by himself. After all, however, the case must be decided, not by the practice of the office, but by the law applicable to it. The practice and decisions would seem to have been variant under different commissioners.

The liberal spirit in which the patent law ought to be construed in favor of honest patentees is so strongly set forth by Judge Marshall in the case of Grant v. Raymond, in 6 Pet. [31 U. S.] 241, 242, that I will cite passages from that opinion of the supreme court. Before giving the extracts, it is proper to say that the decision was made at Jan. term, 1832, more than four years before the act of 4th July, 1836, and that in that case they sustained the reissued patent, even though the secretary of state, who granted it, had then no express power by law to grant a reissue in cases of accident, mistake, or inadvertence on the part of the patentee. Judge Marshall said: "If the new patent can be sustained, it must be on the general spirit and object of the law, not on its letters. To promote the progress of the useful arts is the interest and policy of every enlightened government," &c. "It cannot be doubted that the settled purpose of the United States has ever been, and continues to be, to confer on the authors of useful inventions an exclusive right in their inventions for the time mentioned in the patent. It is the reward stipulated for the advantages derived by the public for the exertions of the individual, and is intended as a stimulus to those exertions. The laws which are passed to give effect to this purpose ought, we think, to be construed in the spirit in which they have been made, and to recite the contract fairly, on the part of the United States, &c. That sense of justice and of right which all feel pleads strongly against depriving the inventor of the compensation thus solemnly promised because he has committed an inadvertent or innocent mistake."

"It has been said that this permission to issue a new patent, or a reformed specification, when the first was defective through the mistake of the patentee, would change the whole character of the act of congress. We are not convinced of this. The great object and intention of the act is to secure to the public the advantages to be derived from the discoveries of individuals; and the means it employs are the compensation made to those individuals for the time and labor devoted to these discoveries by the exclusive right to make, use, and sell the things discovered for a limited time. That which

gives complete effect to this object and intention by employing the same means. for the correction of inadvertent error which are directed in the first instance cannot, we think. be a departure from the spirit and character of the act, &c." "It has been urged that the public was put into possession of the machine by the open sale and use of it under the defective specification, and cannot be deprived of it by the grant of a new patent; the machine is no longer the subject of a patent. This would be perfectly true if the second patent could be considered as independent of the first, but it is in no respect so considered. The communication of the discovery to the public has been made in pursuance of law with the intent to exercise a privilege which is the consideration paid by the public for the future use of the machine. If by an innocent mistake the instrument introduced to secure this privilege fails in its object, the public ought not to avail itself of this mistake, and to appropriate the discovery, without paying the stipulated consideration. The attempt would be disreputable in an individual," &c., &c., "and, a fortiori, I say, in the government of the United States." The supreme court, in the case before them, enlarged the patent law by construction to give effect to its spirit, and to hold the United States to the fair execution of their agreement with the patentee.

The patent office, in the Case of Dyson, before it, with the express power of reissue conferred by the 13th section of the act of 1836, restrains by construction both its letter and spirit, and denies the reissue, unless the patentee proves his case by the original record, the inadvertent and honest error of which record he wants to put right. and which it was the object of the 13th section to enable him to put right. The model and drawings may, and often do, furnish the means to correct the defective description; not so always. The "differential motion" (as it is called) of the stripper, A, is in this case the very gist of the invention. It does not belong properly to the model and drawings to show this differential motion, or the rate of surface speed of any of the cylinders in the engine. This is appropriately the office of the stipulation. Mr. Dyson does not, as I understand, on this application for reissue, propose to modify his model or his drawings. He presents the same model and the same drawings which were offered and received at the office on his original application, and thinks them sufficient for the reissue. It is true, the board of appeals, in their report, say that the model does not show the loose pulley on the shaft of the cylinder, A, but if it was there it would not necessarily show the differential motion, the reduction by the slow pulley of the surface speed of the stripper, A. below the surface speed of the main cylinder, "C," at intervals so as to make "C" a cleaner or stripper of A. The loose pulley is one of the means, and only one, to effect this differential motion. Dyson does not claim a patent for the means, but for the motion. The means are not new, but familiar to every machine. If the fast and loose pulley were on the shaft of the cylinder, A, without specifying the rate of speed to be effected by the loose pulley, it could not be known but that the loose pulley was designed to stop the cylinder,—one of the usual offices, I am told, of the loose pulley. But the 13th section does not, in terms, point to the model and drawings as the sole means of proof, or any means of proof. The whole matter of proof is left at large. It requires that the invention sought to be introduced in the amended description should . be the same. invention originally intended to be patented, and is silent as to how that is to be ascertained.

The spirit of the section, as well as its letter, is to give to the patentee the invention originally intended; and the supreme court say that the United States ought in good faith to confer this on him, as they have promised to do. He is to prove it to be the same invention intended, but the quo modo of proof is not defined, and of course it is open to the patentee to offer any sufficient legal proof, record or otherwise. If he is confined to record proof alone, the office by construction restricts both the letter and spirit of the reissue clause of the act of congress. I refer to the cases of Baltin v. Taggert, 17 How. [58 U. S.] 83, and Allen v. Blunt [Case No. 216], as throwing light on this question. In the last-mentioned case Judge Story says: "Whether the invention claimed in the original patent and that claimed in the new amended patent are substantially the same is, and must be, in many cases, a matter of great nicety and difficulty to decide. It may involve considerations of fact as well as of law." If the office practice is right as laid down in the report of the board of appeals in this case, I do not see how there can be any dispute about "facts." The record, the office says, is conclusive, and no other proof can be received or heard. It would seem Judge Story had in his view aliunde testimony. For the reasons given in this opinion. I think the appellant has sustained his first and second reasons of appeal, and I do, this 21st Sept., 1860, reverse the judgment of the commissioner of date the 7th July, 1860.

If there be no claimant or subsequent unexpired patent for the same invention claimed on this reissue by Mr. Dyson, then I think Jeptha Dyson, the appellant, is entitled, on the proof, to his reissue as claimed by him; but, if there be such claimant or subsequent unexpired patent, then I think an interference ought to be declared, and the parties litigant heard on proof before the office. I return all the papers, model, and drawings to the Hon. Commissioner of Patents, with this, my opinion and judgment.